**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **JAMES HAYES, *et al.*,** )  | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | Civil Action No. 3:14-cv-258 (JAG) |
| ) | |
| **DELBERT SERVICES CORPORATION** ) | |
| **and JOHN PAUL REDDAM,** ) | |
| ) | |
| **Defendants.** ) | |

**[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT**

COME NOW the Plaintiffs, by counsel, and for their Second Amended Class Action Complaint against Defendants Delbert Services Corporation ("Delbert") and John Paul Reddam ("Reddam"), they state as follows:

**INTRODUCTION**

1.      In order to attempt to circumvent state usury, payday lending, and consumer fraud statutes, Reddam created several criminal enterprises, including Delbert Services Corporation Delbert, to market and collect illegal loans. The scheme was designed to violate the usury and payday lending laws of multiple states, to disguise Reddam and his companies' roles, and to ostensibly shield the scheme from liability through a business structure that attempted to exploit Indian Tribal Sovereign Immunity to "avoid state and federal law and to game the entire system." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016).

2.      After this scheme was uncovered through this lawsuit and other actions, Reddam siphoned the assets of Delbert and surreptitiously filed a certificate of dissolution with the Secretary of State for the State of Nevada on March 26, 2015, in an effort to avoid liability in this matter and others. Worse yet, Delbert secretly transferred outstanding loans to CashCall,

Inc., another company controlled by Reddam, who has continued during this litigation to collect millions of dollars from Virginians on these illegal products even though "[n]o one appears to seriously dispute that Western Sky's payday loans violated a host of state and federal lending laws." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 669 (4th Cir. 2016).

3.      At the same time, Delbert continued to defend this lawsuit, including the appeal to the Fourth Circuit, without notifying the Plaintiffs or the Court that it was a now defunct entity who fraudulently conveyed all of its assets in violation of Nevada's dissolution laws.

4.      Prior to the dissolution, Delbert was owned, dominated and controlled by Reddam, who is jointly and severally liable for the claims herein by virtue of his direct personal involvement in the underlying wrongful conduct, and also by piercing the veil of Delbert, the undercapitalized, sham corporation that Reddam created to commit the violations described herein and under the law pertaining to corporate dissolutions.

5.      Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Defendants acted in concert with others to repeatedly violate several federal statutes resulting in the collection of an unlawful debt from Plaintiffs and Class Members. Defendants are both "persons" as defined in 18 U.S.C. § 1961(3), and the usurious debts that they sought to collect and did collect are "unlawful debts" under Section 1961(6). Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962.

6.      Plaintiffs also allege a class claim pursuant to Virginia Code § 6.2-1541, which prohibits any company from making such loans to Virginians in excess of 12% APR unless that company has obtained a consumer finance license from the Virginia State Corporation Commission. Such loans are null and void and the lender or any third-party may not collect,

obtain or receive any principal, interest, or charges whatsoever on said loans. Accordingly, Plaintiff seeks to disgorge all payments made by Virginia consumers to Defendants.

7.      Plaintiffs James Hayes and Debera Grant, on behalf of themselves and all others similarly situated, allege that Delbert, a self-proclaimed "debt collection agency in the broadest sense of the word," violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") by using a form debt validation disclosure notice that did not disclose—and intentionally misrepresented—the name of the creditor to whom the debt was owed. Delbert also violated the FDCPA by sending to consumers, in response to consumer disputes with respect to the debts that Delbert was attempting to collect, debt collection letters that did not contain the 15 U.S.C. § 1692e(11) notice stating that the communication was from a debt collector. (*See* Exs. A, B, C).

8.      Plaintiffs, on behalf of themselves and all others similarly situated, further allege that Defendants violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), by placing non-emergency telephone calls to them and to the putative class members through the use of an automatic telephone dialing system when Plaintiffs did not consent to receive such calls.

## JURISDICTION

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, the FDCPA, 15 U.S.C. § 1692k(d), and the TCPA, 47 U.S.C. § 227.   The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §§1367 and 1332(d)(2).

## PARTIES

10.     Plaintiffs James Hayes ("Mr. Hayes") and Debera Grant, formerly known as Debera Grant-Clarke ("Ms. Grant"), are natural persons who reside in Virginia and in this

District and Division.   Mr. Hayes and Ms. Grant are consumers within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(3).

11.     Plaintiff Herbert White ("Mr. White") is a natural person who resides in Virginia.

12.     Defendant Delbert was during the pertinent times a collection agency, the principal purpose of whose business was the collection of debts, and that maintained its corporate headquarters at 7125 Pollock Drive, Las Vegas, NV 89119.

13.     Defendant Reddam is a citizen and resident of California.   He may be served with process at 7125 Pollock Drive, Las Vegas NV 89119, or at 1600 South Douglas Road, Anaheim CA 92806. During the pertinent times he directed, controlled and owned Delbert, which he set up to collect on purported debts that consumers owed on usurious and unlawful loans. Delbert was incorporated with Reddam as its sole director and sole owner. During the pertinent times as discussed below Reddam had direct personal involvement in the unlawful conduct and misused the corporate form of Delbert to defraud consumers and purported debtors.

14.     During the pertinent times, Delbert regularly collected or attempted to collect debts owed or due or asserted to be owed or due another, and was a "debt collector" within the meaning of the FDCPA, as defined at 15 U.S.C. § 1692a(6).

15.     Defendant Delbert held itself out as follows:

**Delbert Services is a debt collection agency in the broadest sense of the word.**
Delbert Services is licensed, or has the authority to perform collections in 47 states and carries full insurance and bonding protection. Delbert Services utilizes state-of-the-art technology and telecommunications resources. Its proprietary intranet based loan servicing system was designed specifically to handle all types of consumer receivables, from originations through recovery collections. With a commitment to excellence Delbert Services employs a highly knowledgeable management staff/collection group; continuous training and technology. As such, Delbert Services is making quick and large strides to becoming an industry leader.

## FACTS

**A.     Overview of Defendants' Enterprise and Sham Business Structure.**

16.     Delbert operated as a debt collection company that worked together with other entities as described herein to systemically perpetrate fraud and to scam consumers.

17.     Upon information and belief, Reddam is and was the sole owner and chief executive of CashCall and Delbert. Reddam is the architect and chief executive of the unlawful scheme alleged herein.

18.     Western Sky, LLC ("Western Sky") was a South Dakota limited liability company with its principal place of business in Timber Lake, South Dakota. Western Sky transacted business in Virginia through its internet payday loans, including through advertisement, solicitation, and contract with Virginia consumers.

19.     In order to qualify for the internet payday loan, Western Sky required that consumers electronically sign a loan agreement (the "Loan Agreement").

20.     Once the Loan Agreement was electronically signed by a consumer, CashCall was obligated to purchase the promissory note from Western Sky.

21.     Although Western Sky held itself out as the actual lender of these internet payday loans, CashCall funded all the loans purportedly made by Western Sky and the actual entity that performed the underwriting requirements and controlled the loan.

22.     Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by CashCall and Reddam even though Western Sky did not disclose to consumers its relationship with CashCall.

23.     Western Sky never accepted consumer payments after the loan agreement was executed.  Rather, all payments went to CashCall or Reddam-affiliated entities.

24.     As compensation for its role in the deceptive scheme, Western Sky paid CashCall 2.02% of the face value of each approved and executed loan transaction plus any additional charges with a net minimum payment of $100,000 per month.

25.     In return, CashCall agreed to pay Western Sky 5.145% of the face value of each approved and executed loan credit extension and/or renewal and a monthly administration fee of $10,000.

26.     Additionally, CashCall agreed to indemnify Western Sky for all costs arising or resulting from any and all civil, criminal, or administrative claims or actions, including but not limited to fines, costs, assessments, and/or penalties which might arise in any jurisdiction.

27.     The companies engaged in this sham business and deceptive practice in order to evade liability because Westerns Sky held itself out to the public as a standalone tribal entity that was supposedly part of the Cheyenne River Sioux Tribe and, by its assertion, entitled to Native American Tribal Sovereign Immunity.

28.     To that end, Western Sky represented to consumers and argued to regulators that its location made it exempt from state and federal laws (such as lending laws).

29.     In reality, Western Sky was not an actual lender and as explained by the New Hampshire Department of Banking in an order dating from 2013 was "nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."

30.     Although Western Sky operated within the boundaries of the Cheyenne River Sioux Reservation, the Sioux Tribe did not have any ownership interest or operating role in Western Sky, nor did it receive any profits from Western Sky.

31.     Instead, Western Sky was owned and operated by Martin Webb ("Mr. Webb"), who was the sole manager and member of Western Sky.

32.     Mr. Webb was an enrolled member of the Cheyenne River Sioux Tribe, but was not an official of the Tribe and did not represent or act on behalf of the Tribe. He had only a small fraction of Native American lineage, which he exploited in an attempt to assist Reddam's scheme to ostensibly avoid state and federal governance.

33.     In fact, after the New York Attorney General filed suit against Western Sky, the Native American Financial Services Association ("NAFSA") issued a statement that "we applaud this lawsuit and this distinction between those tribal-government owned business who operate legally under federal law, and those who seek to profiteer on the back of hundreds of years of government-to-government relationships. . . . Western Sky does not abide by these consumer-friendly practices, is not an enterprise wholly owned by a federally-recognized tribe, is not regulated by a tribal regulatory lending authority, according to tribal law, and breaks the covenants meant to benefit tribal governments and their members."

34.     But the New York Attorney General is not alone in its attention to this sham business model. The United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein. Attached as Exhibit D is the Tucker indictment, which sets out a strikingly similar set of facts, including: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating

costs and infrastructure of s single lending business"; and (4) Mr. Muir acted as general counsel

for one of the Tucker entities. (Ex. D ¶¶ 1–3.) The indictment continues:

> From at least in or about 1997 up to and including in or about August 2013, through the Tucker Payday Lenders, SCOTT TUCKER and TIMOTHY MUIR, the defendants, systematically exploited over four and a half million working people throughout the United States who were struggling to pay basic living expenses, including for food and housing. TUCKER and MUIR, through the Tucker Payday Lenders, extended loans to these individuals at usurious interest rates as high as 700% or more using deceptive and misleading communications and contracts, and in violation of the usury laws of numerous states, including New York State, that were designed to protect residents from such loan sharking and abusive conduct. In doing so, TUCKER and MUIR forced many of these individuals into cycles of debt in which they incurred new usurious payday loans - including from the Tucker Payday Lenders - in order to pay off their existing debt.
>
> * * *
>
> Also beginning in approximately 2003, to defeat the state lawsuits [relating to their illegal lending practices], to attempt to avoid future civil and criminal liability for his conduct, and to enable the Tucker Payday Lenders to persist in extending usurious loans contrary to state laws, SCOTT TUCKER, the defendant, entered into sham business relationships with certain Native American tribes (collectively, "Tribes 1–3") and thereafter claimed that the Tucker Payday Lenders could not be sued because they were entitled to the protection of "tribal sovereign immunity," a legal doctrine that generally prevents states from enforcing their laws against Native American tribes. In particular, to defeat the state lawsuits, attorneys for TUCKER, including TIMOTHY MUIR, the defendant, prepared and submitted to courts materially false and misleading affidavits about the relationship between Tribes 1–3 and the Tucker Payday Lenders to create the false impression that Tribes 1–3 played a substantive role in the ownership and operation of the Tucker Payday Lenders. In truth and in fact, as TUCKER and MUIR well knew and privately admitted, Tribes 1–3 played no such role, and were instead deliberately used by TUCKER and MUIR as mere conduits for TUCKER'S unlawful business. In reliance on these materially false and misleading affidavits, state courts dismissed certain state lawsuits on "tribal sovereign immunity" grounds.

(Ex. D ¶¶ 4, 6.)

35.    The Tucker indictment further outlines the defendants' scheme to violate the

usury and payday lending laws of multiple states and the Truth In Lending Act. (*Id.* ¶¶ 8–11.)

36.     Just like the Defendants here, Mr. Tucker's business relationship with the Indian tribes was nothing more than a failed attempt to shield their illegitimate businesses with the protection of tribal immunity:

> In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

> Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

(Ex. D ¶¶ 23–24.)

37.     The indictment alleges violations of RICO, among others. (*Id*. ¶¶ 28–45.)

38.     Like Mr. Tucker, the other competitors of Defendants have seen similar government scrutiny of their business practices. Just last month, the U.S. District Court for the Eastern District of Pennsylvania unsealed the indictment of Charles M. Hallinan, Wheeler K. Neff, and Randall P. Ginger, asserting counts like those brought against Tucker and Muir and alleged here. (*See* Exhibit E.)

39.     Like Reddam and Mr. Tucker, Mr. Hallinan and his cohorts lent and collected payday loans to thousands of consumers over the Internet at usurious interest rates, violating multiple state and federal laws. (*Id.* ¶¶ 1–14.)

40.     And also like Reddam and Tucker, Mr. Hallinan "rented" Indian Tribes to protect his sham businesses from regulators and lawsuits:

> Starting in or around 2003, defendant CHARLES M. HALLINAN and other payday lenders devised new methods to issue payday loans to customers across the country, including in the Prohibited Payday Lending States and the Regulated Payday Lending States. One method was to enter into sham business agreements with federally-recognized Indian tribes that were designed to make it appear that the tribes owned the payday lending entities. That way, whenever a state tried to enforce its laws against a payday lending company, the tribe would claim that it owned the entity and did not have to comply with such laws because it had "sovereign immunity."

> In reality, the Indian tribes had very little connection to the day-to-day operations of the payday lending operations. Typically the tribes did not provide the money advanced for the payday loans, service the loans, collect on the loans, or incur any losses if the borrowers defaulted. Those functions were conducted solely by non-tribal payday lenders, such as defendant CHARLES M. HALLINAN and the Hallinan Payday Loan Companies. The tribes' sole function was to act as false fronts for the Hallinan Payday Loan Companies and assert "sovereign immunity" whenever necessary to evade the laws in the Prohibited Payday Lending States and the Regulated Payday Lending States.

> This model was widely characterized throughout the payday lending industry as "rent-a-tribe[.]" ….

> Defendant CHARLES M. HALLINAN, aided and abetted by defendant WHEELER K. NEFF, entered into multiple partnerships with Indian tribes, pursuant to which defendant HALLINAN paid the tribes at least $10,000 a month in return for the tribes' agreement to claim ownership of various Hallinan Payday Loan Companies and assert "sovereign immunity" whenever one of the Prohibited Payday Loan States or Regulated Payday Loan States, or residents of those states tried to enforce state laws against those companies.

> In or around 2003 and 2004, defendant CHARLES M. HALLINAN, on behalf of various Hallinan Payday Loan Companies, executed contracts with representatives of a federally-recognized Indian tribe in Oklahoma that were designed to enable defendant HALLINAN and the Hallinan Payday Loan Companies to evade state anti-usury laws and other restrictions on payday

lending. From approximately 2004 until at least late 2008, defendant HALLINAN paid this Oklahoma-based tribe to pretend that it issued payday loans, which were actually funded, serviced, and collected upon by various Hallinan Payday Loan Companies.

(Ex. E ¶¶ 20–24.)

41.     Like with Mr. Tucker and for Reddam in this case, the Hallinan group also faces charges that they violated RICO in collecting unlawful loans, defrauding consumers using the U.S. mail, and fraudulently asserting tribal immunity as a defense to their crimes. (*Id.* ¶¶ 28–56, Counts 1–17.)

42.     Like his major competitors, Reddam and his affiliated entities attempted to avoid state laws through this sham structure and unenforceable forum selection and arbitration provisions.

43.     Defendants' debts are not only illegal and unenforceable, but the arbitration and forum-selection clauses are void and unenforceable as well. *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 676 (4th Cir. 2016) ("But rather than use arbitration as a just and efficient means of dispute resolution, Delbert seeks to deploy it to avoid state and federal law and to game the entire system.").

**B.     Involvement and Personal Liability of Defendant Reddam.**

44.     During the pertinent times, Reddam was the director and sole owner of Delbert, and dominated and controlled its business and operations.

45.     At all times relevant, Reddam was also the sole owner and shareholder, president, and director of CashCall; and the president and sole member, manager, and owner of WS Funding.

46.     At all times relevant, Reddam was the control person and directed, controlled, and had managerial responsibility for the activities of CashCall, WS Funding, and Delbert, including the unlawful practices alleged herein.

47.     Reddam formed and used his wholly-owned companies, including Delbert, to engage in unfair, deceptive, and abusive acts that harmed the Plaintiffs and Class Members.

48.     Reddam used his various sham entities, including Delbert, to perpetrate a nationwide scheme to collect full payment on small-dollar loans that state licensing and usury laws had rendered wholly or partially void or uncollectible, including in Virginia.

49.     Reddam during the pertinent times solely owned these companies, ran their operations, and in many instances personally secured the licenses for Delbert to collect the purported loan debt in various states. Reddam designed and set into motion the subterfuge lending scheme that led to the unlawful debt collection efforts of Delbert and the unlawful autodialer and cellular telephone calls.

50.     In 2009, Reddam had a series of meetings with the Mr. Webb, the owner of Western Sky, a limited liability company. (Exhibit G, Van Beek Aff., Att. X ¶ 7; this and the other affidavits and attachments cited below were filed in the case of *Consumer Financial Protection Bureau v. CashCall, Inc., et al.,* No. 2:15-cv-07522-JFW-RAO (C.D. Cal.).) These meetings resulted in agreements that Reddam signed in early 2010.  These agreements put in place a program whereby loans made in Western Sky's name would be marketed, financed, purchased, serviced, and collected by Reddam's companies.

51.     Reddam personally,, directly and actively managed the activities of Delbert and CashCall.  In 2010, Reddam averred that he "runs the day-to-day operations of CashCall which currently originates and services unsecured loans.  All of the company's department heads report

directly to Mr. Reddam.  He is responsible for devising and implementing all major company policies – including its various loan programs and interest rates." (Ex. G, Meade Aff., Atts. A-C, *see* "Biography" section; Exhibit H, Costa Aff., Att. A.)

52.     Reddam's finances were intertwined with those of Delbert. Reddam's control and sole owner status yielded him substantial sums, including from the loan payments Delbert collected from consumers.  These revenues inured directly to his personal benefit as the sole owner of Delbert, and his finances were inextricably linked to that of his companies.

53.     Reddam participated in and knew of the actions of Delbert in Virginia which are the subject of this lawsuit.  Reddam chose Virginia as a State where loans and Delbert collection efforts would ensue.

54.     Reddam during the pertinent times was directly and materially involved in the intentional misconduct and knew the subject loan and debt collection scheme was a scam and was illegal under Virginia law, but pursued it anyway via his companies, CashCall and Delbert.

55.     Reddam shut down Western Sky in September 2013.

56.     Further, in March 2015 while this action was pending and without revealing this fact to the Plaintiffs, this Court or the United States Court of Appeals, Reddam caused the formal dissolution of Delbert and fraudulently conveyed its assets. He has not complied with Nevada law with regard to such dissolution.

57.     Additionally, for nothing of value, Delbert transferred all outstanding debts from Reddam's operation to CashCall, who continued to collect millions of dollars on these otherwise illegal and unenforceable products from Virginia consumers *through the date of this filing*.

58.     In other words, Reddam, through CashCall, has personally pocketed many millions of dollars in improperly obtained revenues on loans he knew were illegal, leaving Delbert undercapitalized for the purpose of satisfying any judgment in this lawsuit.

59.     Reddam did all of this in the face of ongoing State and Federal governmental actions against him and his companies, as well as countless federal lawsuits.

60.     Despite generating millions of dollars in revenue over the last several years, in response to Plaintiffs' Requests for Admissions in this lawsuit, Delbert claims that its net worth is today less than $50,000.

61.     Accordingly, Reddam is jointly and severally liable for the claims herein by: (1) virtue of his direct personal involvement in the underlying fraudulent conduct; (2) as a result of the fraudulent transfer of Delbert's assets in violation of Nevada's dissolution laws; and (3) by piercing the veil of Delbert, the undercapitalized, sham corporation that Reddam created to commit the violations.

**C.      Plaintiffs' Loans Charge Interest in Violation of Virginia Code § 6.2-1541.**

62.     Reddam, through his closely-held veil entities, marketed Western Sky internet loans to Virginians. Under the terms of the resulting loan agreements, the interest rates charged were significantly greater than 12% APR.

63.     For example, Defendants charged Mr. Hayes and Ms. Clarke with 139% APR. (*See* Dkt. No. 7-1).

64.     Section 6.2-1541 of the Virginia Code prohibits any person from making such loans to Virginians in excess of 12% APR unless that company has obtained a consumer finance license from the Virginia State Corporation Commission.  *See* Va. Code § 6.2-1501.

65.     Reddam, Western Sky and CashCall did not have a consumer finance license when they made these loans and they never have had such a license.

66.     Under Va. Code § 6.2-1541, if a lender was not exempt from the provisions of those statutes and had not obtained a consumer finance license, yet nonetheless contracted to make a consumer loan, and charged, contracted for, or received, interest or other compensation in excess of 12% per year, then the loan was and is null and void and the lender is not able to collect, obtain or receive any principal, interest or charges whatsoever on said loan.

67.     Each of Defendants' loans to consumers contained interest rates over 12% per year even though Defendants did not obtain a consumer finance license.

68.     Accordingly, Defendants' loans were null and void and it is unlawful for Defendants or any Reddam-affiliated to collect or receive any principal, interest or charges whatsoever on said loans, including the amounts paid by each of the Plaintiffs.

**D.      Factual Allegations Relating to Plaintiff Hayes' FDCPA Claims.**

69.     Defendants sought to collect from Mr. Hayes an internet payday loan debt allegedly past due placed with "Consumer Loan Trust" by Western Sky Financial, LLC ("Western Sky") and/or CashCall.

70.     The internet payday loan debt was incurred primarily for personal, family, or household purposes, bringing Defendants' collection efforts within the purview of the FDCPA. 15 U.S.C. § 1692a(5).

71.     Defendants sent Mr. Hayes a dunning letter dated January 21, 2014 in an attempt to collect the alleged debt. A copy of the letter is attached hereto as Exhibit A.

72.     Exhibit A does not contain the name of the creditor to whom the debt is owed.

73.     "Consumer Loan Trust" is not the name of an actual or identifiable creditor.

74.     In response to Mr. Hayes' written dispute to Defendants with respect to the alleged debt, Defendants sent Mr. Hayes the letter attached hereto as Exhibit B.

75.     Exhibit B does not disclose that the communication is from a debt collector.

76.     The omission of the disclosure that the communication is from a debt collector is a violation of 15 U.S.C. § 1692e(11).

77.     The FDCPA "expressly prohibits this exact *omission* by requiring debt collectors to disclose their status in every communication with a consumer." *Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 374 (4th Cir. 2012) (emphasis in original).

78.     Exhibit B further contains the following language:

> Western Sky is a wholly Cheyenne River Sioux Tribal Member owned business and is located and operates within the exterior boundaries of the Cheyenne River Indian Reservation. Western Sky loans are initiated, approved, issued, and disbursed within the confines of the Cheyenne River Indian Reservation. Western Sky is licensed with the Cheyenne River Sioux Tribe. The laws of the Cheyenne River Sioux Tribe apply exclusively to the terms and conditions of your loan, and you further accepted this choice of law and jurisdiction by executing your loan document.

79.     As more fully explained below, this statement contains several misrepresentations, including that a legal debt exists, that Western Sky approved and issued the loan, and that the laws of the Cheyenne River Sioux Tribe apply exclusively to the terms and conditions of the loan.

**E.     Factual Allegations Relating to Plaintiff Grant's FDCPA Claims.**

80.     Defendant Delbert attempted to collect on an internet payday loan debt from Ms. Grant.

16

81.     The internet payday loan debt was incurred by Ms. Grant primarily for personal, family, or household purposes, bringing the Defendant's collection efforts within the purview of the FDCPA. 15 U.S.C. § 1692a(5).

82.     In response to Ms. Grant's written dispute to Defendant with respect to the alleged debt, Defendant sent Ms. Grant the letter attached hereto as Exhibit C.

83.     Exhibit C does not disclose that the communication is from a debt collector.

84.     Exhibit C also contains the misrepresentations identified above with regard to the letter attached as Exhibit B.

85.     The omission of the disclosure that that the communication is from a debt collector is a violation of 15 U.S.C. § 1692e(11).

86.     The FDCPA "expressly prohibits this exact *omission* by requiring debt collectors to disclose their status in every communication with a consumer." *Warren*, 676 F.3d at 374.

**F.     Delbert Contacts Mr. Hayes, Ms. Clarke and Mr. White's Cellular Telephones Without Their Consent.**

87.     Plaintiffs each maintain a cellular telephone through a single carrier.

88.     The service for their cellular phone is via a "cellular telephone service" as described in 47 U.S.C. § 227(b)(1)(A)(iii).

89.     Plaintiffs use their cell phones to maintain personal contacts with family and friends and for emergency contact.

90.     From January 1, 2014 forward, Defendants launched a collection campaign against Plaintiffs calling them on their cell phones to collect on their accounts for these illegal loans.

91.     This resulted in Plaintiffs receiving calls multiple times a week and on some days, multiple times a day.

92.     Plaintiffs never gave their consent to Defendants to call their cell phones.

93.     Each of the calls at issue herein occurred within the preceding four years.

94.     In these calls, Defendants delivered a message or voicemail to Plaintiffs using an artificial or pre-recorded voice.

95.     Upon information and belief, Defendants used an "automatic telephone dialing system" ("ATDS" or "autodialer") as defined by 47 U.S.C. § 227(a)(1) to initiate each of these calls to the Plaintiffs and Class Members.

96.     Reddam understood that his best means for Delbert to collect these loans was by telephone harassment.  Because of the loans were unlawful Defendants could not and did not ever sue to collect these debts through a court process.

97.     The calls from Defendants caused numerous interruptions and disruptions to Plaintiffs' work, social engagements, and recreation.

98.     Upon information and belief, Defendants used their autodialer system to contact large numbers of person to collect debts on behalf of Western Sky, CashCall, and other creditors.

99.     Prior to making its automated calls, Defendants failed to vet or verify that the persons they were calling with their automated dialer were in fact persons who had expressly consented to being contacted via these means.

100.    Upon information and good-faith belief, Defendants intended to use an automatic telephone dialing system to make and/or place each of the telephone calls identified above.

**COUNT ONE:**
**VIOLATIONS OF RICO, 18 U.S.C. §§ 1961–1968**
**(CLASS CLAIM)**

101.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

102.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia RICO Class"—initially defined as:

> All Virginia residents who executed a loan with a Reddam-affiliated company where the loan was transacted and/or any payment was made on or after the date two years preceding the filing of this action.

103.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

104.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members.   These questions predominate over the questions affecting only individual class members.

105.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

106.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to

continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

107.   **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the Class members. Plaintiff and the putative class seek an injunction ordering the Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting the Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

**A.      The Enterprise.**

108.   As alleged above, Defendants, along with Martin Webb, Cesar Guzman, Western Sky, CashCall, WS Funding and others not yet known to Plaintiffs, engaged in a racketeering activity, namely, the making and collection of unlawful debts and the fraudulent obtaining of the funds of consumers through the U.S. mail and by wire transfer.

109.   Defendants, together with Martin Webb, Cesar Guzman, Western Sky, CashCall, WS Funding, Experian and others not yet known to Plaintiffs, constituted an "enterprise," meaning "a group of individuals associated in fact," (hereafter "the Enterprise") as defined in 18 U.S.C. § 1961(4). This Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

110.   The members of the Enterprise derived income through the "collection of unlawful debt," that is, "a debt (A) . . . which is unenforceable under State . . . law in whole or in part as to the principal or interest because of the laws relating to usury, and (B) which was

incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State . . . law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

111.    The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. For example, and without limitation, even though Delbert is now dissolved, the Enterprise continues to attempt to collect on loans to Virginia consumers even though Defendants' violation of Virginia's state-usury and licensing laws vitiated all of the consumers' obligations to repay the loans.

**B.      The Purpose Of The Enterprise.**

112.    As alleged above, the Enterprise established its sham business and deceptive practice whereby Western Sky was created and then held out to the public as a stand-alone tribal entity who is supposedly part of the Tribe and, by its claim, was entitled to Native American sovereign immunity.

113.    Although Defendants held Western Sky out as the actual lender of these illegal pay day loans, Reddam (through CashCall) actually funded the purported "tribal" loans made by Western Sky and is the actual person and entity that performed the underwriting requirements. In other words, to facilitate the blatant violation of state interest-rate lending laws, the Enterprise stamped Western Sky's name on the loan for the sole purpose of serving as a "rent-a-tribe" when, in fact, the loans and representations were by no means from the tribes themselves.

114.    The Enterprise existed to obtain money for its members and associates through the deceptive creation and the collection of unlawful debt, that is, debt which was unenforceable in most of the states where the Enterprise operated because the debts had arisen from payday

loans that violated usury laws and other consumer protection statutes and regulations that had

been enacted and promulgated in the states where the borrowers lived.

115.    It was also a purpose of the Enterprise to maintain and expand the profits of the

Enterprise through the reinvestment of moneys received from the collection of unlawful payday

loans into the Enterprise.

**C.     The Racketeering Conspiracy.**

116.    Since at least June 27, 2010, the Enterprise and others not yet known to Plaintiffs

but employed by and associated with the Enterprise, being persons employed by and associated

with the Enterprise, which engaged in, and the activities of which affected, interstate and foreign

commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to

conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise

through the collection of unlawful debt, as that term is defined by 18 U.S.C. § 1961(6).

117.    As described above, the Enterprise engaged in a pattern of unlawful debt

collection and racketeering activity. This pattern, includes among other things, violations of mail

and wire fraud statutes when Defendants mailed and transmitted by computers the fraudulent

Loan Agreements and other communications regarding the Loan Agreements; by debiting

amounts from consumers' bank accounts through Automated Clearing House (ACH)

transactions; by debiting the unlawful payments from consumers' bank accounts, of which a

substantial part were the unlawful interest and loan fees; by demanding repayment of loan

payments (and failing to disclose that their loans were void) through repeated telephone calls,

letters and other communications to Plaintiffs and Class Members; and by using the United

States Postal Services to send misleading communications to Plaintiffs and consumers as an

integral means to collect the unlawful loans and to deceive consumers regarding the purported tribal affiliation of the loans.

118.    For example, on August 6, 2012, Defendants and the Enterprise committed wire fraud as defined in 15 U.S.C. § 1343 when they provided (or caused to be provided) Mr. Hayes with the Loan Agreement, which contained a series of material misrepresentations and/or concealments, including but not limited to: (1) that Western Sky Financial was the lender of the loan; (2) that no state or federal law or regulation shall apply to the enforcement of the Loan Agreement; (3) that the lender of the Loan Agreement is not subject to the laws of any state; and (4) by falsely implying that the loans were provided by the Cheyenne River Sioux Tribe.

119.    As reflected by the Loan Agreement of Ms. Grant dated August 18, 2012, Defendants' misrepresentations were part of a pattern and practice of false representations and use of false pretenses for the purpose of collecting unlawful debts from consumers.[1]

120.    Additionally, on January 21, 2014, Defendants mailed written correspondence to Plaintiff Hayes in an attempt to collect a debt. (Ex. A). In this communication, Defendants misrepresented that "Consumer Loan Trust" was the creditor to whom the debt was owed (in an effort to conceal the roles of the various entities in the Enterprise. *Id*. Defendants' correspondence—which was a form notice mailed to thousands of consumers—also falsely implied that they were legally authorized to collect the associated balances and fees, and that consumers were legally obligated to pay the full amount demanded.[2]

---

[1] In response to Plaintiffs' Requests for Admissions, Delbert implicitly acknowledged the existence of at least 17,000 loans in Virginia alone.

[2] In response to Plaintiffs' Requests for Admissions, Delbert admitted that it mailed approximately 2,577 letters in the form of Exhibit A to borrowers in Virginia since April 10, 2013.

121.    Defendants also made a number of misrepresentations to Plaintiff Hayes in correspondence mailed on or around February 22, 2014. (Ex. B). For example, the February 22, 2014 falsely indicated: (1) his loan "was funded by Western Sky Financial"; (2) "[t]he laws of the Cheyenne River Sioux Tribe apply exclusively to the terms and conditions of your loan[.]"; and (3) that "Western Sky loans are initiated, approved, issued and disbursed within the confines of the Cheyenne River Indian Reservation." *Id.*

122.    In carrying out this unlawful debt collection and racketeering activity, the Enterprise utilized the United States Postal Services and wires, which were an integral part of carrying out their scheme to defraud consumers. The collection of unlawful debt through which the Defendants agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, consisted of the collection of unlawful debt, meaning debts which were unenforceable under the laws of the Commonwealth of Virginia and other States in whole and in part as to principal and interest and which were incurred in connection with the business of lending money at a rate usurious under the laws of the United States, the Commonwealth of Virginia and other States where the usurious rate is at least twice the enforceable rate. It was part of the conspiracy that the Defendants agreed that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the Enterprise.

123.    This conduct began sometime as early 2009 and continues to date and will be repeated again and again in the future to the detriment of consumers.

124.    The collection of unlawful debt through which the Defendants agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, consisted of the collection of unlawful debt, meaning debts which were unenforceable under the laws of the Commonwealth of Virginia and other States in whole and in part as to principal and interest and

which were incurred in connection with the business of lending money at a rate usurious under the laws of the United States, the Commonwealth of Virginia and other States where the usurious rate is at least twice the enforceable rate. It was part of the conspiracy that the Defendants agreed that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the Enterprise.

125.    Moreover, the conduct and actions of the Enterprise violated the federal mail and wire statutes, 18 U.S.C. §§ 1341, 1343.

**D.    Manner and Means.**

126.    Defendants, together with other members of the Enterprise and individuals not yet known to Plaintiffs, "rented" the Cheyenne River Sioux Tribe in an attempt to cloak the Enterprise in tribal immunity so that it could further its illicit goals.

127.    The Enterprise was engaged in, and these activities and goals of the Enterprise affected, interstate commerce.

128.    Defendant Reddam, the sole principal of Delbert, CashCall and WS Funding, with the Enterprise used the relationships between those entities and Webb's entities to make and collect unlawful debts and to transfer the proceeds from those illicit activities among the members of the Enterprise, including himself.

129.    Defendants and the Enterprise made and attempted to collect loans they knew violated state payday lending and usury laws, but continued those efforts anyway.

130.    Moreover, after the Fourth Circuit's decision in this case, Delbert and Reddam transferred "ownership" of the loans to CashCall, who is now collecting and threatening to enforce the provisions of the Loan Agreements.

131.    At best, Defendants and the Enterprise paid the Cheyenne River Sioux Tribe a nominal fee for their use of its immunity, while reaping millions of dollars in revenue under the cloak of immunity for the benefit of the Enterprise and Reddam personally.

132.    The Enterprise's activities in deceptively making and collecting unlawful loans violated 18 U.S.C. § 1962(b), (d).

133.    Plaintiffs, class members and third parties relied upon the false statements, sham entities and subterfuge to their material detriment.  They suffered actual damages in the form of any interest, fees, or other payments made pursuant to the unlawful Loan Agreements.

134.    Plaintiffs and the Class Members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees or other sums collected by Defendants.

### COUNT TWO:
### VIOLATIONS OF VIRGINIA USURY
### (CLASS CLAIM)

135.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

136.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Usury Class"—initially defined as:

> All Virginia residents who executed a loan with a Reddam-affiliated company and/or one that was serviced or collected by Delbert where both the date of the last scheduled loan payment and the date of payment of the loan in full (if any) occurred on or after the date 2 years prior to the filing of this action.

137.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained

by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

138.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members.   These questions predominate over the questions affecting only individual class members. The principal issues include:

a.   Whether Defendant Reddam may be held personally responsible for usurious loans made by CashCall and Western Sky?

b.   Whether the loans made by CashCall and Western Sky violated Virginia Code Section 6.2-1501 because their interest levels were too high?

c.   Whether Plaintiffs and Class Members are entitled to recover the total amount of interest paid, plus twice the amount of interest paid during the two years preceding this lawsuit, along with reasonable attorneys' fees and costs under Virginia Code § 6.2-305?

139.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

140.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

141.    **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the Class members.

142.    The dispute and controversy is a justiciable matter which is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the subject loans.

143.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity of the forum-selection and arbitration clauses in the Loan Agreements.

144.    All of the loans that Reddam and his companies made to Virginia residents included and demanded the payment of interest at a rate greater than 12%.

145.    None of the exceptions to and within Va. Code ¶6.2-303 apply.

146.    Plaintiffs and class members are entitled to recover from Defendants an amount equal to the total amount of interest paid in excess of 12%, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action.

147.    Plaintiffs and class members are entitled to a declaratory judgment that they are not indebted to Delbert or Reddam and his affiliated companies.

148.    Reddam and Delbert have acted on grounds that apply generally to the class in attempting to collect debts originated by Western Sky and/or CashCall that are void and unenforceable.

149.    Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully move for entry of an injunction prohibiting Reddam and Delbert from collecting debts from Virginia Consumers that were originated by Western Sky or CashCall.

**COUNT THREE:**
**VIOLATION OF THE FDCPA, 15 U.S.C. § 1692g(a)(2)**
**(CLASS CLAIM)**

150.    Plaintiff Hayes repeats and realleges every allegation above as if set forth herein in full.

151.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Hayes brings this action for himself and on behalf of a class—the "Name of the Creditor Class"— initially defined as:

> All Virginia residents to whom Defendant Delbert sent a letter (A) in the form of Exhibit A, (B) which contains the 15 U.S.C. § 1692g notice of validation rights in text identical to that in Exhibit A, (C) in an attempt to collect a debt allegedly due to "Consumer Loan Trust," (D) that was incurred primarily for personal, household or family purposes, (E) during the one-year period prior to the filing of the Complaint in this matter.

152.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiff alleges that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

153.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include:

a.  Whether Defendant Delbert Services Corporation is a debt collector.

b.  Whether Delbert's correspondence in the form of Exhibit A violated the FDCPA by failing disclose the name of the creditor to whom the debt is owed, as required by 15 U.S.C. § 1692g(a)(2).

c.  Whether Reddam is jointly and severally liable due to his direct personal involvement in the wrongful conduct, his status as owner of the now-dissolved company, or under the doctrines of alter ego liability and piercing the corporate veil.

154.  **Typicality. Fed. R. Civ. P. 23(a)(3).**  Plaintiff's claims are typical of the claims of each putative class member.  In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

155.  **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the putative class, because his interests coincide with, and are not antagonistic to, the interests of the members of the Class he seeks to represent; he has retained counsel competent and experienced in such litigation; and he has and intends to continue to prosecute the action vigorously.  Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Class.  Neither Plaintiff nor his counsel have any interests which might cause them not to vigorously pursue this action.

156.  **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them.  Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts.  Furthermore,

individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

157.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiff and the Class members.

158.    By sending a 15 U.S.C. § 1692g debt validation notice that does not contain the name of the creditor to whom the debt is owed, Defendants failed to provide the required validation notice and in so doing violated 15 U.S.C. § 1692g and g(a)(2).

159.    Plaintiff Hayes and the putative class members are therefore entitled to statutory damages against Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k.

**COUNT FOUR:**
**VIOLATION OF THE FDCPA, 15 U.S.C. § 1692e**
**(CLASS CLAIM)**

160.    Plaintiffs Hayes and Grant restate each of the allegations in the preceding paragraphs as if set forth at length herein.

161.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1692e(11) Class"—initially defined as:

(A)   All Virginia residents to whom Defendants sent a letter in the form of Exhibits B or C, (B) which does not contain the § 1692e(11) disclosure that the "communication is from a debt collector," (C) in an attempt to collect a debt that

31

was incurred primarily for personal, household or family purposes, (D) during the one year period prior to the filing of the Complaint in this matter.

162.   **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

163.   **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include:

a.   Whether Delbert Services Corporation is a debt collector.

b.   Whether Delbert's correspondence in the form of Exhibit B or C violated the FDCPA by omitting the disclosure that the communication is from a debt collector, as required by 15 U.S.C. § 1692e(11).

c.   Whether Reddam is jointly and severally liable due to his direct personal involvement in the wrongful conduct, his status as owner of the now-dissolved company, or under the doctrines of alter ego liability and piercing the corporate veil.

d.   If Defendants violated the FDCPA, what is the appropriate amount of damages?

164.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

165.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

166.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them.  Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts.  Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

167.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the Class members.

168.     By omitting from Exhibit B or Exhibit C the disclosure that the communication is from a debt collector, Defendants violated 15 U.S.C. § 1692e(11).

169.     Plaintiffs and the putative class members are therefore entitled to statutory damages against Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692.

**COUNT FOUR:**
**VIOLATION OF THE FDCPA, 15 U.S.C. § 1692e(2) & e(10)**
**(CLASS CLAIM)**

170.     Plaintiffs Hayes and Grant restate each of the allegations in the preceding paragraphs as if set forth at length herein.

171.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1692e Class"—initially defined as:

> (A)  All Virginia residents to whom Defendants sent a letter in the form of Exhibit B or C, (B) which contained the text misrepresenting the character and legal status of the debt (C) in an attempt to collect a debt that was incurred primarily for personal, household or family purposes, (D) during the one year period prior to the filing of the Complaint in this matter.

> § 1692e(10) subclass: (A) All Virginia residents to whom Defendant sent a letter in the form of Exhibit A, (B) which contains the 15 U.S.C. § 1692g notice of validation rights in text identical to that in Exhibit A, (C) that misrepresented that debt was allegedly due to "Consumer Loan Trust," (D) that was incurred primarily for personal, household or family purposes, (E) during the one year period prior to the filing of the Complaint in this matter.

172.     **Numerosity. Fed. R. Civ. P 23(a)(1).**   Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

173.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include:

   a.      Whether Delbert is a debt collector?

   b.      Whether Delbert's correspondence in the form of Exhibit B or C violated the FDCPA by misrepresenting the character and legal status of the debt, including but not limited to its misrepresentations that a legal debt exists, that Western Sky approved and issued the loan, and that forum-selection clause was valid and enforceable?

   c.      Whether Reddam is jointly and severally liable due to his direct personal involvement in the wrongful conduct, his status as owner of the now-dissolved company, or under the doctrines of alter ego liability and piercing the corporate veil.

   d.      If Defendants violated the FDCPA, what is the appropriate amount of damages?

174.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

175.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately

protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

176.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them.  Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts.  Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

177.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the Class members.

178.   Defendants violated 15 U.S.C. § 1692e(2)(A) by misrepresenting in correspondence in the form of Exhibit B and C that a legal debt existed, that Western Sky approved and issued the loan, and that forum-selection clause was valid and enforceable.

179.   Likewise, by sending a 15 U.S.C. § 1692g debt validation notice that intentionally misrepresented the name of the creditor to whom the debt is owed, Defendants used false

representations or deceptive means to collect or attempt to collect debts, and in so doing violated 15 U.S.C. § 1692e(10).

180.    Plaintiffs and the putative class members are therefore entitled to statutory damages against Defendants, as well as their reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692.

**COUNT FIVE:**
**VIOLATIONS OF THE TCPA, 47 U.S.C. § 227(b)(1)(A)(iii)**
**(CLASS CLAIM)**

181.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

182.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs White bring this action for themselves and on behalf of a State and National class—the "TCPA National Class" and the "TCPA Virginia Sub- Class" and —initially defined as follows:

> **National Class**:  All persons within the United States, who: (A) on or after June 27, 2010, received a non-emergency telephone call from Delbert; (B) to a cellular telephone through the use of an automatic telephone dialing system and/or pre-recorded voice; and (C) who did not provide prior express consent for such calls by Delbert.

> **Virginia SubClass**:  All persons within the Commonwealth of Virginia, who: (A) on or after June 27, 2010, received a non-emergency telephone call from Delbert; (B) to a cellular telephone through the use of an automatic telephone dialing system and/or pre-recorded voice; and (C) who did not provide prior express consent for such calls by Delbert.

183.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

184.     **Predominance of Common Questions of Law and Fact.   Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members.   These questions predominate over the questions affecting only individual class members. The principal issues include:

a.   Whether Delbert uses an autodialer to collect debts;

b.   Whether Delbert made nonemergency calls to the Plaintiffs and the class members' cellular telephones using an automatic telephone dialing system;

c.   Whether Delbert's use of the automatic telephone dialing system was knowing and/or willful;

d.   Whether any blanket consent asserted by Defendants applies to Delbert or is otherwise applicable; and

e.   Whether Reddam is jointly and severally liable due to his direct personal involvement in the wrongful conduct, his status as owner of the now-dissolved company, or under the doctrines of alter ego liability and piercing the corporate veil.

185.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

186.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately

protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

187.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them.  Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts.  Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

188.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs Hayes, White and the Class members.

189.   Defendants negligently violated the TCPA, 47 U.S.C. § 227, in relation to the Plaintiffs and the Class Members, by making debt-collection calls to them on their cellular telephones using an ATDS and without their prior consent to receive such calls.

190.    As a result of Defendants' negligent violations of the TCPA, Plaintiffs and the class members may recover statutory damages of $500 for each and every call in violation of the statute.

191.    Alternatively, Defendants knowingly or willfully violated the TCPA in relation to Plaintiffs and the class members.

192.    As a result of Defendants' willful violations of the TCPA, Plaintiffs and class members may recover statutory damages of up to $1,500 per call in violation of the statute.

**COUNT SIX:**
**VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT –**
**VA. CODE § 59.1-196, *et seq.***
**(CLASS CLAIM)**

193.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

194.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Consumer Protection Class"—initially defined as:

> All Virginia residents who executed a loan with a Reddam-affiliated company where the loan was transacted and/or any payment was made on or after the date five years preceding the filing of this action.

195.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants and the class members may be notified of the pendency of this action by published and/or mailed notice.

196.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members.  These questions predominate over the questions affecting only individual class members.

197.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

198.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

199.     **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiffs and the Class members.

200.     As alleged above, Defendants violated the VCPA through their conduct, including but not limited to: (1) through their misrepresentations regarding the source of the loans in violation of Va. Code § 59.1-200(2); (2) by misrepresenting the affiliation and role of Western Sky and the Cheyenne River Sioux Tribe in violation of § 59.1-200(3); (3) misrepresenting the

characteristics and terms of the loans in violation of  § 59.1-200(5); (4) advertising the loans with the intent not to offer them as advertised in violation of § 59.1-200(8); and (5) using deception, fraud, false pretense and misrepresentations in connection with the loan transactions as alleged at length herein.

201.    Plaintiffs, class members and third parties relied upon Defendants' false statements, sham entities and subterfuge to their material detriment. They suffered actual damages in the form of their loans.

202.    Defendants were "suppliers" in connection with a "consumer transaction", and Plaintiffs and class members were "consumers", all as defined and governed by the VCPA.

203.    Plaintiffs and Class Members are entitled to the greater of $500 or their actual damages, as well as attorneys' fees and costs of suit. Va. Code § 59.1-204.

204.    Defendants' violations of the VCPA were willful and intentional.  As a result, Plaintiffs and Class Members are entitled to the greater of $1,000 or their treble their actual damages. as well as attorneys' fees and costs of suit.

205.    Plaintiffs also seek disgorgement by Defendant of all monies received from Virginia residents for the subject loans and an injunction against further solicitation and collection of the loans.

206.    Any otherwise applicable statutes of limitations have been tolled by the discovery rule with respect to Plaintiffs' VCPA claims, which relate back to the claims in the initial Complaint. Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and the Class Members could not have discovered Defendants misrepresentations and concealments in violation of the VCPA.

### COUNT SEVEN:
### PERSONAL LIABILITY OF REDDAM

## (CLASS CLAIM)

207.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

208.    Plaintiffs allege that Reddam is personally liable for the claims alleged above because he personally directed the conduct upon which those claims are based. He is also liable for the additional reasons alleged herein.

209.    During the pertinent times, Reddam owned and controlled Delbert and had principal responsibility and legal accountability for its operations.

210.    At all times relevant, Reddam was the sole owner and shareholder, president, and director of CashCall; the president and sole member, manager, and owner of WS Funding; and the sole director and sole owner of Delbert.

211.    Reddam was the control person and directed, controlled, and had managerial responsibility for the activities of Delbert, including the unlawful practices alleged herein.

212.    Reddam formed and used his wholly-owned companies including Delbert to engage in unfair, deceptive, and abusive acts that harmed the Plaintiffs and the Classes. Under the circumstances, he engaged in a misuse of the corporate form justifying the corporate veil to be pierced. Further, even absent piercing the corporate veil, he is liable due to his direct, personal involvement in the unlawful conduct alleged herein.

213.    Reddam and his companies perpetrated a nationwide scheme to collect full payment on small-dollar loans that state licensing and usury laws had rendered wholly or partially void or uncollectible, including in Virginia.

214.    Reddam, during the pertinent times solely owned these companies, ran their operations, and secured the licenses for Delbert to collect the purported loan debt in various states.

215.    Reddam personally signed the agreements that allowed the Western Sky loan program to occur and in turn the Delbert loan collection efforts.

216.    As the president, CEO, sole director and sole shareholder of Delbert, during the pertinent times, Reddam dominated and controlled its business collecting on the loans, engaging in auto-dial calls, and harassing purported debtors regarding loans that Reddam knew or should have known were illegal.

217.    Reddam personally secured many of the state licenses under which Western Sky loans would be collected by Delbert. Reddam ordered Delbert to seek full repayment on loans he knew were made under a subterfuge, from borrowers including the Plaintiffs.

218.    Reddam's control and sole owner status at Delbert yielded him substantial sums, including from the loan payments Delbert collected from consumers here.   These revenues inured directly to his personal benefit as the sole owner of Delbert.

219.    Reddam chose Virginia as a State where Delbert collection efforts would ensue.

220.    As a direct and proximate result of Reddam's decisions and conduct in setting up and implementing the CashCall/Western Sky loan program, these fraudulent loans were issued to residents of Virginia including the Plaintiffs, applying usurious and unlawful interest rates, causing damage to their credit standing, leading to improper and unlawful collection efforts and telephone harassment, and otherwise injuring and harming the Plaintiffs and the putative Classes.

221.    Reddam during the pertinent times was directly and materially involved in the intentional misconduct and knew the subject loan and debt collection scheme was a scam and was illegal under Virginia law, but pursued it anyway via Delbert.

222.    More recently, Reddam ordered Delbert to be dissolved as a corporate entity and has retained substantial monies from Delbert.

223.    According to records of the Nevada Secretary of State's Office, a certificate of dissolution was filed with regard to Delbert on or about March 25, 2015.  Under the Nevada Revised Statutes, NRS § 78.585, the dissolution of a corporation does not impair any remedy or cause of action available against it or its directors, officers or stockholders commenced within two years after the date of the dissolution.

224.    Under NRS § 78.585, the corporation continues as a body corporate for the purpose of defending suits, actions, proceedings and claims of any kind or character against it.

225.    Under NRS § 78.597, Reddam, as the stockholder of the dissolved corporation, is liable with regard to the subject claims brought against Delbert as a now-dissolved corporation.

226.    Under the circumstances, Delbert acted as an alter ego of Reddam and the corporate form for Delbert may be disregarded and the veil may be pierced so as to render Reddam directly and personally jointly and severally liable to the named Plaintiffs and to the class under all Counts alleged hereinabove.

227.    In addition, Reddam is directly and personally jointly and severally liable to the named Plaintiffs and to the Classes under all Counts alleged hereinabove due to his direct and personal participation in the unlawful business and collection activities of Delbert.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs James Hayes, Debera Grant, and Herbert White request that the Court enter judgment on behalf of themselves and the classes they seek to represent against Defendants Delbert Services Corporation and John Paul Reddam for:

A.    Certification for this matter to proceed as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3);

B.    Declaratory, injunctive and damages relief as pled herein;

C.    Attorney's fees, litigation expenses and costs of suit; and

D.    Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Dated: May 5, 2016                              Respectfully submitted,

                                                JAMES HAYES, *et al.*
                                                By Counsel

                                                _____/s/_____
                                                Kristi C. Kelly, Esq., VSB #72791
                                                Andrew J. Guzzo, VSB#82170
                                                KELLY & CRANDALL, PLC
                                                4084 University Drive, Suite 202A
                                                Fairfax, VA 22030
                                                (703) 424-7572
                                                (703) 591-0167 Facsimile
                                                Email: kkelly@kellyandcrandall.com
                                                Email: aguzzo@kellyandcrandall.com

                                                Leonard A. Bennett, VSB #37523
                                                Susan M. Rotkis, VSB #40639
                                                Craig C. Marchiando, VSB #89736
                                                CONSUMER LITIGATION ASSOCIATES, P.C.
                                                12515 Warwick Boulevard, Suite 201
                                                Newport News, Virginia 23606
                                                (757) 930-3660
                                                (757) 930-3662 Facsimile
                                                Email: lenbennett@clalegal.com
                                                Email: srotkis@clalegal.com

James W. Speer, VSB#23046
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

Dale W. Pittman, VSB#15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 Facsimile
Email: dale@pittmanlawoffice.com

Janet Varnell, Esq.
Florida Bar No. 0071072
Varnell and Warwick, P.A.
20 La Grande Boulevard
The Villages, FL 32159
Telephone: 352-753-8600
Fax: 352-753-8606525
Email: jvarnell@varnellandwarwick.com

Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
Email: mwallace@wallacegraham.com
Email jhughes@wallacegraham.com

*Counsel for Plaintiffs*

**EXHIBITS:**
   A.  letter dated January 21, 2014
   B.  Letter dated February 22, 2014
   C.  Letter to dated December 6, 2013
   D.  Tucker Indictment
   E.  Hallinan Indictment
   F.  Van Beek Aff. & Atts. D, E, T, X
   G.  Meade Aff. & Atts. A-C.

H.  Costa Aff. & Att. A.

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of May, 2016 I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification to all counsel of record.

Joseph Barloon
Warren Thomas Allen, II
Jennifer Zoe Gindin
Clifford Sloan
Skadden Arps Slate Meagher & Flom LLP (DC)
1440 New York Ave NW
Washington, DC 20005-2111
joseph.barloon@skadden.com
wtallen@skadden.com
jennifer.gindin@skadden.com
cliff.sloan@skadden.com

Thomas Nolan
Skadden Arps Slate Meagher Flom LLP
300 S Grand Ave #3400
Los Angeles, CA 90071
Thomas.nolan@skadden.com

_____/s/_____
Kristi Cahoon Kelly, Esq. (VSB #72791)
KELLY & CRANDALL PLC
4084 University Drive, Suite 202A
Fairfax, VA 22030
703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyandcrandal.com
*Counsel for Plaintiffs*