# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

COMMONWEALTH OF VIRGINIA
*EX REL.* MARK R. HERRING,
ATTORNEY GENERAL,

*Plaintiff-Intervenor*,

v.

CASHCALL, INC.,
a California corporation,
and

J. PAUL REDDAM,
an individual,

*Defendants*.

**Civil Action No. 3:14-cv-258-JAG**

JAMES HAYES, et al.,

*Plaintiffs*,

v.

DELBERT SERVICES CORPORATION,
JOHN PAUL REDDAM,
and CASHCALL, INC.,

*Defendants*.

## COMPLAINT IN INTERVENTION

    The Plaintiff-Intervenor, Commonwealth of Virginia, by, through, and at the relation of the

Attorney General of Virginia, Mark R. Herring (the "Intervenor" or the "Commonwealth"),

petitions this Court to declare that the activities in which the Defendants, CashCall, Inc.

("CashCall"), and its sole owner and chief executive officer ("CEO"), J. Paul Reddam

("Reddam") (collectively, "Defendants"), have engaged constitute violations of §§ 59.1-200(A)(2), (3), (5) and (14) of the Virginia Consumer Protection Act ("VCPA").

## PRELIMINARY STATEMENT

The Commonwealth files this Complaint with the goal of providing relief to over 17,000 Virginia consumers deceived by Defendants' unlawful "rent-a-tribe" lending scheme. CashCall became active in the consumer lending industry in 2003. After its previous lending model (which involved state-chartered, federally-insured banks) met with regulatory scrutiny,[1] CashCall began using a "rent-a-tribe" lending model. In this model, CashCall used the purported tribal affiliation of Western Sky Financial, LLC ("Western Sky"), to make loans supposedly subject only to the laws and jurisdiction of a Native American tribe. Thus, CashCall's loans would be free from state usury laws—except for one problem. Western Sky's tribal affiliation was entirely fabricated.

At the marketing level, Western Sky appeared on television and on the Internet as a "tribal" lender, using teepee images and referring to its status as a Native American business. This fiction was reinforced when consumers applied for, and received, their loans. Western Sky's standard loan agreement touted an affiliation with the Cheyenne River Sioux Tribe ("CRST") of South Dakota, and claimed that it was subject only to the laws and jurisdiction of the CRST. But the truth was that Western Sky was neither organized under CRST law nor owned by the CRST; it was a South Dakota limited liability company. The truth was that Western Sky was not even the actual lender; CashCall provided marketing support, and underwrote, funded, and serviced each loan. Top to bottom, the Western Sky loan program was nothing more than a scam Reddam used to attempt to exempt CashCall's loans from state usury laws.

---

[1] *See, e.g.,* CashCall, Inc. v. Morrisey, No. 12-1274, 2014 W. Va. LEXIS 587, *2-3 (W. Va. Supreme Court, May 30, 2014) (memorandum decision), cert. denied, 135 S. Ct. 2050 (2015); CashCall, Inc. v. Maryland Comm'r of Fin. Reg., 139 A.3d 990, 995 n.12 (Md. 2016).

Regulators saw through this scheme. In January of 2011, the Colorado Attorney General filed what appears to be the first public enforcement action scrutinizing the deceptive Western Sky loan program. Numerous state and federal enforcement actions and private lawsuits ensued over the coming years, and, today, "No one appears to seriously dispute that Western Sky's . . . loans violated a host of state and federal lending laws."[2] Indeed, CashCall has been found to be the true or *de facto* lender despite "renting" a Native American tribe to originate its loans, and Reddam has been held personally liable for his active participation in, and control over, the Western Sky loan program.[3]

In sum, the foregoing history of Defendants' attempts to avoid state usury laws shows how willfully they violated the VCPA. It was not until September of 2016 that Defendants finally ceased their operations in the Commonwealth of Virginia—***five years*** after the Colorado Attorney General notified them of the illegality of their rent-a-tribe scheme. Thus, for over five years, CashCall knowingly collected millions of dollars from Virginia consumers on loans that should have been capped at 12% annual interest by Virginia Code § 6.2-303(A). But, by using the Western Sky loan program, CashCall deceived Virginia consumers and charged annual interest at rates between 58% and 238%.

Accordingly, Virginia consumers affected by Defendants' willful VCPA violations are entitled to considerable relief. The Commonwealth therefore prays that this Court grant the relief requested in its Complaint and states the following in support thereof:

## JURISDICTION AND VENUE

1. The Intervenor brings its Complaint in Intervention pursuant to its authority in Virginia Code § 59.1-203, which provides, *inter alia*, that the Attorney General may bring an action to

---

[2] Hayes v. Delbert Servs. Corp., 811 F.3d 666, 669 (4th Cir. 2016).
[3] Consumer Fin. Prot. Bureau v. CashCall, Inc., No. 15-cv-7522, 2016 U.S. Dist. LEXIS 130584, at *19 (C.D. Cal. Aug. 31, 2016).

enjoin any violation of the VCPA. As alleged herein, Defendants violated §§ 59.1-200(A)(2), (3), (5) and (14) of the VCPA.

2. This Court has supplemental jurisdiction over the Intervenor's VCPA claims pursuant to 28 U.S.C. 1367(a) because the Intervenor's claims are so related to the claims of Plaintiffs James Hayes et al., over which this Court has original jurisdiction, that they form the same case or controversy.

3. Prior to the commencement of this action, the Intervenor gave the Defendants written notice that its claims were contemplated. In that written notice, the Defendants were afforded a reasonable opportunity either to appear before the Office of the Attorney General to demonstrate that they had not violated the VCPA, or, to execute an Assurance of Voluntary Compliance ("AVC"), pursuant to Virginia Code § 59.1-203(B). The Defendants were not able to demonstrate that they did not violate the VCPA, but agreed to execute an acceptable Stipulated Final Judgment and Order in lieu of an Assurance of Voluntary Compliance.

## PARTIES

4. The Plaintiff-Intervenor is the Commonwealth of Virginia, by, through, and at the relation of Mark R. Herring, Attorney General of Virginia.

5. The Defendant, CashCall, Inc., is a California corporation with its principal place of business at 1 City Boulevard West, Suite 1000, Orange, California 92868. CashCall registered to conduct business in the Commonwealth of Virginia on August 10, 2010.

6. Upon information and belief, the Defendant, J. Paul Reddam, is a resident of Sunset Beach, California. During all relevant times, and since August 10, 2010, Reddam served, and continues to serve, as the CEO of CashCall, and was and is its sole owner.

7. Whenever any reference is made in this Complaint to any act of the "Defendants" or to the acts of any one of them, such allegations shall be deemed to include CashCall and Reddam,

acting jointly and severally, as if the act of any one of them were the act of the other, whether as principal, under an express or implied agency, or with actual or apparent authority to perform the acts alleged.

## FACTS

### *Defendants' Lending History*

8. Reddam has been the CEO and sole owner of CashCall since its creation.

9. In 2003, Reddam involved CashCall in the consumer lending industry to compete with payday loan companies in the State of California.

10. In 2006, one of CashCall's financiers conditioned further funding of CashCall's lending operations in the State of California upon diversifying its default risk by expanding its operations nationwide.

11. To expand its operations nationwide, CashCall paid two stated-chartered, federally-insured banks to make loans that, in turn, CashCall would purchase, service, and collect.  These banks were First Bank & Trust of Millbank, South Dakota, and First Bank of Delaware.  CashCall used these state-chartered, federally-insured banks as a means to originate loans that it would later claim to be exempt from state usury laws.

12. On June 10, 2008, Sandra L. Thompson, Director of the Federal Deposit Insurance Corporation's ("FDIC") Division of Supervision and Consumer Protection issued a "Notice of Charges for an Order to Cease and Desist and for Restitution" to the First Bank of Delaware— one of the banks used by CashCall.[4]  The FDIC's notice specifically refers to the "Consumer Loan Marketing, Origination, and Sale Agreement dated as of January 15, 2007 between CashCall, Inc. and First Bank of Delaware."

---

[4] A copy of the FDIC's notice is available at
 https://www.fdic.gov/news/news/press/2008/FBD_Notice_of_Charges.pdf.

*Defendants' Transition to the Rent-a-Tribe Scheme*

13. Due to regulatory scrutiny from the FDIC, Reddam sought a new way to make CashCall's loans exempt from state usury laws. Otherwise, CashCall's lending operations would not have been profitable enough to continue. Reddam therefore made the decision to switch to a "rent-a-tribe" scheme.

14. The rent-a-tribe scheme included an arrangement whereby CashCall would use a third party to originate loans that would, by virtue of the third party's purported or actual tribal status, be subject to tribal law and free from state usury laws.

15. CashCall's general counsel was introduced to Martin "Butch" Webb ("Webb"), an enrolled member of the Cheyenne River Sioux Tribe ("CRST") who worked in the tribal payday lending industry in South Dakota. At that time, Webb and CashCall's general counsel discussed originating and selling "tribal" loans to CashCall.

16. Webb formed Western Sky Financial, LLC ("Western Sky"), in late 2009 to be the façade behind which CashCall would operate its rent-a-tribe lending scheme. Webb was, and still is, Western Sky's sole owner.

17. Although Webb is an enrolled member of the CRST and the sole owner of Western Sky, Western Sky was not, and is not, owned by the CRST.

18. Western Sky was not organized pursuant to the laws of the CRST.

19. Western Sky was organized under the laws of South Dakota as a limited liability company.

20. Reddam ultimately made the decision to implement CashCall's Western Sky loan program in early 2010.

*The Structure of CashCall's Rent-a-Tribe Scheme*

21. Two agreements were necessary to implement CashCall's rent-a-tribe scheme.

22. First, CashCall and Western Sky entered into an "Agreement for Service" ("Service Agreement").[5] Pursuant to the Service Agreement, CashCall—not Western Sky—was obligated to provide marketing services for the Western Sky loan program, to provide customer support for consumers using the Western Sky loan program, to host the website where consumers would apply for Western Sky loans, and to underwrite the loans.

23. The Service Agreement further required CashCall to establish a toll-free telephone and fax number for Western Sky, and to provide electronic communication systems (e-mail and text), for Western Sky to use when communicating with consumers.

24. In exchange for these services, Western Sky paid CashCall 2.02% of the face value of each loan that it sold to CashCall as explained below.

25. The Service Agreement evidences a high level of operational control that CashCall, and thus Reddam, had over the creation and implementation of the Western Sky loan program.

26. Second, the Defendants' rent-a-tribe scheme needed a means for CashCall to fund loans made by Western Sky. For that reason, Reddam created WS Funding, LLC ("WS Funding"). WS Funding is a wholly-owned subsidiary of CashCall, and Reddam is its president.

27. Pursuant to the "Agreement for the Assignment and Purchase of Promissory Notes" ("Assignment Agreement") entered into by WS Funding and Western Sky, WS Funding opened "a demand deposit account in the name of Western Sky" that Western Sky used to fund the loans.[6]

---

[5] A true and accurate copy of the Service Agreement is attached hereto as Exhibit A.
[6] A true and accurate copy of the Assignment Agreement is attached hereto as Exhibit B.

28. Western Sky was then required under the Assignment Agreement to assign all Western Sky loans to WS Funding. In return for assigning the loans to WS Funding, Western Sky received 5.145% of the loan value.

29. The Assignment Agreement further obligated WS Funding to indemnify Western Sky for "all costs arising or resulting from any and all civil, criminal or administrative claims or actions, including but not limited to fines, costs, assessments and/or penalties, which may arise in any jurisdiction."

30. Western Sky's actual involvement in and control over the Western Sky loan program was minimal, as was its economic interest in the loans. On the other hand, CashCall's economic interest in the Western Sky loan program was great; it bore all the risk of non-payment and enjoyed all the benefit of collecting the loans. The extent of CashCall's interest in the Western Sky loan program can also be seen in the Assignment Agreement, in which WS Funding agreed to indemnify Western Sky.

31. In sum, the Service Agreement and Assignment Agreement illustrate that Western Sky was nothing more than a façade used to make CashCall's loans appear governed by tribal law and exempt from state usury laws. The risks and rewards of the Western Sky loan program, as well as control of its operation and funding, ultimately resided with CashCall and Reddam.

### *Defendants' Use of the Rent-a-Tribe Scheme in the Commonwealth of Virginia*

32. Beginning in 2010, Defendants used the Western Sky loan program to solicit and make high-interest, usurious loans to residents of the Commonwealth of Virginia online and over the telephone.

33. The following screenshot illustrates how the Western Sky website would have appeared to a Virginia consumer on March 16, 2012:[7]



34. On information and belief, the above images and language, or substantially the same images and language, were posted on Western Sky's website for the entire period during which CashCall implemented the Western Sky loan program in the Commonwealth of Virginia. Thus, Virginia consumers who applied online for Western Sky loans would have seen misleading images of teepees, and read misleading language, all of which combined to misrepresent Western Sky's tribal affiliation.

35. On information and belief, Western Sky television ads aired in the Commonwealth of Virginia, and those ads included images of teepees and contained similar language regarding

---

[7] This website is no longer available, but this particular screenshot from the website is accessible through an internet archival service at http://web.archive.org/web/20120316004718/http://www.westernsky.com/.

Western Sky's status as a Native American business.[8]  These television ads also misled consumers into believing that Western Sky was affiliated with a Native American tribe.

36. Western Sky's form loan agreement misrepresented that it was the lender, and that its loan agreement was subject solely to the laws and jurisdiction of the CRST.  The following excerpt from a Western Sky loan agreement made to a Virginia consumer makes this clear:[9]

> **This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.** By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.
>
> You further agree that you have executed the Loan Agreement as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.
>
> In this Loan Agreement, the words "you" and "your" mean the person signing as a borrower. "We," "us," "our," and "Lender" mean Western Sky Financial, LLC, a lender authorized by the laws of the Cheyenne River Sioux Tribal Nation and the Indian Commerce Clause of the Constitution of the United States of America, and any subsequent holder of this Note ("Western Sky").
>
> TRUTH IN LENDING DISCLOSURES: The disclosures below are provided to you so that you may compare the cost of this loan to other loan products you might obtain in the United States. Our inclusion of these disclosures does not mean that we consent to application of state or federal law to us, to the loan, or this Loan Agreement.

37. Western Sky's form loan agreement further included a "Governing Law" provision in which Western Sky claimed the agreement was "governed by the Indian Commerce Clause of the Constitution of the United States of America and the laws of the Cheyenne River Sioux Tribe."

38. Accordingly, the language of Western Sky loan agreements misled consumers into believing that Western Sky was the lender, that it was a Native American entity, and that its

---

[8]  An example of Western Sky's television ads can be viewed at https://www.youtube.com/watch?v=aWjB9yGety0.
[9]  A true and accurate copy of this Western Sky loan agreement is attached hereto as Exhibit C.

loans were governed only by CRST law and the Indian Commerce Clause of the United States Constitution.

39. Despite these misrepresentations, the laws of the CRST and the Indian Commerce Clause of the United States Constitution had no reasonable relationship to any loans made by CashCall to Virginia consumers under its Western Sky loan program. No Virginia consumers traveled to South Dakota or any land owned by or in possession of the CRST to execute a loan pursuant to CashCall's Western Sky loan program. Western Sky was not organized under CRST law nor owned by the CRST.

40. Despite these misrepresentations, Virginia law, including the 12% annual interest limitation prescribed by Virginia Code § 6.2-303(A), applied to each loan CashCall made to Virginia consumers under its Western Sky loan program. Neither CashCall nor Western Sky qualified for any exception to the 12% annual interest limitation prescribed by Virginia Code § 6.2-303(A). Pursuant to Virginia Code § 6.2-306, Virginia consumers could not have waived the interest rate limitation prescribed by Virginia Code § 6.2-303(A) by entering into a loan agreement with CashCall pursuant to its Western Sky loan program. And, the Commonwealth of Virginia recognizes a fundamental public policy against usury, rendering the Western Sky loan agreement's choice of law provision unenforceable.

41. CashCall made approximately 17,046 usurious loans to Virginia consumers and, through its Western Sky loan program, misled Virginia consumers into believing that only CRST law applied and that Virginia Code § 6.2-303(A) did not limit the annual interest rate to 12% or less. Accordingly, these consumers suffered losses as a result of Defendants' use of the deceptive Western Sky loan program.

42. Unknown to Virginia consumers at the time of loan origination, the loans they received under the deceptive Western Sky loan program were actually funded by a wholly-owned subsidiary of CashCall, WS Funding.

43. Unknown to Virginia consumers at the time of loan origination, the loans they received under the deceptive Western Sky loan program were already scheduled to be sold by Western Sky to WS Funding within days of origination.

44. After WS Funding acquired the Virginia consumers' loans, CashCall contacted each of the Virginia consumers within days, informed them that it had acquired their loans, and directed them to make all payments to CashCall—not Western Sky.

45. Based on complaints Virginia consumers filed with the Office of the Virginia Attorney General, the following table summarizes some of the Western Sky loan program offerings made by CashCall to Virginia consumers:

| Principal | Annual Percentage Rate ("APR") | Total Cost | Term |
|---|---|---|---|
| $2,525.00 | **138.57%** | $13,995.62 | 48 months |
| $2,525.00 | **139.63%** | $14,102.87 | 48 months |
| $1,000.00 | **238.45%** | $4,768.98 | 24 months |
| $2,525.00 | **138.76%** | $14,015.12 | 48 months |
| $2,525.00 | **140.04%** | $13,849.37 | 47 months |
| $5,000.00 | **116.80%** | $40,880.81 | 84 months |
| $2,525.00 | **139.44%** | $14,083.37 | 48 months |

***Reddam's Complicity in the Rent-a-Tribe Scheme***

46. Reddam is the CEO, president, sole director, and sole owner of CashCall.

47. Reddam is the president, manager, sole member, and sole owner of WS Funding, the wholly-owned subsidiary of CashCall that provided funding for the Western Sky loans and that acquired Western Sky loans.

48. Reddam's personal finances have been tied to CashCall since it entered the consumer lending market. In 2003 or 2004, Reddam made a personal loan of approximately $21 million to CashCall. Later, CashCall's Western Sky loan program was funded, in part, through loans from hedge funds, including Alpha Credit Resources, LLC, f/k/a Centurion Credit Resources, LLC. Reddam personally guaranteed CashCall's loans from these hedge funds.

49. Reddam has always had ultimate authority over CashCall's operations. In 2009, Reddam filed a sworn statement with the Connecticut Department of Banking, Consumer Credit Division, in which he stated that he: (1) "runs the day-to-day operations of CashCall, which currently originates and services unsecured loans of $10,000;" (2) "is responsible for devising and implementing all major company policies – including its various loan programs and interest rates;" and (3) "coordinates all marketing and advertising, and determines where advertising should be directed."[10] In the same statement, Reddam further indicated that "[CashCall's department heads report directly to [him]."

50. Reddam was involved with negotiating the Service Agreement and Assignment Agreement pursuant to which the Western Sky loan program operated, and signed both documents.

---

[10] A certified copy of the "Personal and Business History Statement of John Paul Reddam" that Reddam filed with the Connecticut Department of Banking, Consumer Credit Division, is attached hereto as Exhibit D. It is important to note that, in this statement, Reddam swore to the fact that CashCall "originates" loans, despite his and CashCall's claims to the contrary in various Western Sky enforcement actions and lawsuits.

51. Reddam made the decision to wind down the Western Sky loan program in 2013 due to regulatory concerns, but did not direct CashCall to cease servicing and collecting its Virginia loans until September of 2016.

## CAUSES OF ACTION

### COUNT I – Virginia Consumer Protection Act

52. The Commonwealth re-alleges and incorporates by reference the allegations of Paragraphs 1 through 51 of this Complaint.

53. Pursuant to Virginia Code § 59.1-197, the VCPA is to be applied as remedial legislation to promote fair and ethical standards of dealing between suppliers and the consuming public.

54. In connection with consumer transactions, the VCPA prohibits suppliers from, among other things:

    a. Misrepresenting the source, sponsorship, approval, or certification of goods or services pursuant to Virginia Code § 59.1-200(A)(2);

    b. Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services, with another pursuant to Virginia Code § 59.1-200(A)(3);

    c. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits pursuant to Virginia Code § 59.1-200(A)(5); and

    d. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction pursuant to Virginia Code § 59.1-200(A)(14).

55. During all relevant times, CashCall was a "supplier" of "goods" or "services" in connection with "consumer transactions" as those terms are defined in Virginia Code § 59.1-198.

56. CashCall violated the VCPA through the acts and practices described in this Complaint, including without limitation:

14

a. Misrepresenting that Western Sky was the lender on CashCall's Virginia loans in violation of Virginia Code §§ 59.1-200(A)(2), (3) and (14);

b. Misrepresenting that Western Sky is a Native American business entity in violation of Virginia Code §§ 59.1-200(A)(2), (3) and (14);

c. Misrepresenting that Western Sky loans were subject only to the laws and jurisdiction of the CRST in violation of Virginia Code §§ 59.1-200(A)(5) and (14);

d. Misrepresenting that the Western Sky loans were governed by the Indian Commerce Clause in violation of Virginia Code §§ 59.1-200(A)(5) and (14);

e. Misrepresenting that the Western Sky loans were not subject to federal laws, or the laws of the Commonwealth of Virginia, in violation of Virginia Code §§ 59.1-200(A)(5) and (14); and

f. Misrepresenting the legality of charging more than 12% annual interest in the Commonwealth of Virginia in violation of Virginia Code §§ 59.1-200(A)(5) and (14).

57. CashCall willfully engaged in the acts and practices described in this Complaint in violation of the VCPA.

58. Individual consumers have suffered losses as a result of the aforesaid violations of the VCPA by CashCall.

## <u>Count II – Individual Liability of Reddam for his Active Participation</u>

59. The Commonwealth re-alleges and incorporates by reference the allegations of Paragraphs 1 through 58 of this Complaint.

60. A corporation can act only through its officers and agents, and where the business itself involves a violation of the law, all who participate in it are liable.

61. During all relevant times, Reddam, individually or together with others, directed, controlled, approved, or participated in the acts and practices of CashCall, including those acts and practices that are the subject of this Complaint.

62. By virtue of his active participation in the wrongful acts of CashCall, Reddam should be held personally liable for all violations of the VCPA committed by or through CashCall.

63. Individual consumers suffered losses as a result of Reddam's use and control of CashCall and his implementation of the Western Sky loan program.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, Commonwealth of Virginia, prays that this Court:

A. Permanently enjoin Defendants and their officers, employees, agents, successors and assigns from violating § 59.1-200 of the VCPA pursuant to Virginia Code § 59.1-203;

B. Grant judgment against the Defendants, jointly and severally, and award to the Commonwealth all sums necessary to restore to any consumers the money or property acquired from them by Defendants in connection with their violations of § 59.1-200 of the VCPA pursuant to Virginia Code § 59.1-205;

C. Enter any additional orders or decrees as may be necessary to restore to any consumers the money or property acquired from them by Defendants in connection with their violations of § 59.1-200 of the VCPA pursuant to Virginia Code § 59.1-205;

D. Grant judgment against the Defendants, jointly and severally, and award to the Commonwealth civil penalties of up to $2,500.00 per violation for each willful violation of § 59.1-200 of the VCPA pursuant to Virginia Code § 59.1-206(A), the exact number of violations to be proven at trial;

E. Grant judgment against the Defendants, jointly and severally, and award to the Commonwealth its costs, reasonable expenses incurred in investigating and preparing the case up to $1,000.00 per violation of § 59.1-200 of the VCPA, and attorneys' fees pursuant to Virginia Code § 59.1-206(C); and

F. Grant such other and further relief as this Court deems equitable and proper.


COMMONWEALTH OF VIRGINIA,
*EX. REL.* MARK R. HERRING,
ATTORNEY GENERAL

By: _____/s/_____
James E. Scott (VSB No. 88882)
Assistant Attorney General
Consumer Protection Section
Predatory Lending Unit
202 North Ninth Street
Richmond, Virginia 23219
Phone: (804) 786-7364
Fax: (804) 786-0122

Mark R. Herring
Attorney General

Cynthia E. Hudson
Chief Deputy Attorney General

Richard S. Schweiker, Jr.
Chief and Senior Assistant Attorney General

David B. Irvin (VSB No. 23927)
Unit Manager and Senior Assistant Attorney General
Assistant Attorney General
Consumer Protection Section
Predatory Lending Unit
202 North Ninth Street
Richmond, Virginia 23219
Phone: (804) 786-7364
Fax: (804) 786-0122